<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

---

|  |  |  |
|---|---|---|
| NICHOLAS CONCHEWSKI, | : | |
| | : | Civil Action No. 11-2781(NLH) |
| Plaintiff, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| CAMDEN COUNTY, et al., | : | |
| | : | |
| Defendants. | : | |

---

**APPEARANCES:**

Nicholas Conchewski
P.O. Box 421
Clayton, NJ  08312
        Plaintiff <u>pro</u> <u>se</u>

Howard Lane Goldberg, Esq.
Office of Camden County Counsel
520 Market Street
Courthouse – 14th Floor
Camden, NJ  08102-1375
        Counsel for Defendants Camden County,
        Camden County Correctional Facility, Warden Eric M. Taylor

Thomas J. Decker, Esq.
Decker & Magaw, Esqs.
507 Westfield Avenue
Westfield, NJ 07090
        Counsel for Defendant CFG Health Systems, LLC

Daniel James Distasi, Esq.
William Leo Lundgren, III, Esq.
Green, Lundgren & Ryan, P.C.
20 Brace Road – Suite 200
Cherry Hill, NJ  08034
        Counsel for Defendant Juranjah H. Holland

**HILLMAN**, District Judge

This matter is presently before the Court pursuant to the submission of Motions [Doc. Nos. 24, 28, 56] for Summary Judgment by Defendants Camden County, Camden County Correctional Facility, Warden Eric M. Taylor, CFG Health Systems, LLC ("CFG"), and Nuranjah H. Holland.

For the reasons stated below, the Motions will be granted.

I.   BACKGROUND

A.   Procedural Background

Plaintiff Nicholas Conchewski originally filed this matter in the New Jersey Superior Court, Camden County.  Following removal of the action to this Court, see 28 U.S.C. §§ 1441 and 1446, Plaintiff filed a Third Amended Complaint [Doc. No. 12]. In that Third Amended Complaint, Plaintiff asserts claims arising out of an injury he allegedly sustained as a result of suffering a seizure and fall while confined at Camden County Correctional Facility, and as allegedly aggravated by a subsequent automobile accident.

He names as defendants Camden County, Camden County Correctional Facility, Warden Eric M. Taylor (collectively, herein, the "Camden County Defendants"), the Director of Correctional Services (not identified by name), CFG, Nuranjah H.

2

Holland, and fictitious defendants John Does 1 through 50.[1]  More
specifically, Plaintiff asserts that the Camden County
Defendants acted with deliberate indifference to his safety, a
claim arising under the Eighth Amendment and, according to
Plaintiff, under 42 U.S.C. § 1985(3), as well as state law
negligence.  (Third Amended Complaint, Doc. No. 12, Second
Count, Third Count, Fourth Count.)  Plaintiff contends that
Warden Taylor was responsible for the care and management of the
prisoners confined in the Camden County Correctional Facility
and for establishing and implementing appropriate standards,
policies, procedures, customs and practices to protect ill or
physically unstable prisoners.  Plaintiff alleges Camden County
and the Camden County Correctional Facility are liable as the
employers of one or more of the individual named defendants.
Plaintiff asserts that CFG failed to properly assess and monitor
Plaintiff's condition and medication needs to prevent him from
coming to harm, again in violation of the Eighth Amendment.[2]

---

[1] Plaintiff has never identified or served the Director of
Correctional Services or any of the fictitious defendants.
Accordingly, as discovery has closed, all claims against these
unidentified defendants will be dismissed with prejudice.  See
Hindes v. F.D.I.C., 137 F.3d 148, 155-56 (3d Cir. 1998); Hargis
v. Aramark Correctional Service, LLC, No. 10-1006, 2013 WL
3465189, *15 (D.N.J. July 10, 2013); Fed.R.Civ.P. 21.

[2] Plaintiff's claim against CFG is limited to a violation of the
Eighth Amendment under 42 U.S.C. § 1983.  (CFG Motion, Ex. B.)

(Third Amended Complaint, Fifth Count.)  Plaintiff further alleges that "[o]ne, some or all" of the Defendants failed to make reasonable accommodations for his medical conditions in violation of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-12, et seq.  (Third Amended Complaint, Sixth Count.) Plaintiff also contends that the Defendants violated his rights under the New Jersey Civil Rights Act, N.J.S.A. 10:6-1, et seq. (Third Amended Complaint, Seventh Count.)  Finally, with respect to the automobile accident, Plaintiff alleges that Defendant Nuranjah H. Holland negligently caused an automobile accident that aggravated his condition.  (Third Amended Complaint, Eighth Count.)

Discovery ended on September 28, 2012; Plaintiff's expert reports were due on or before October 31, 2012; Defendant's expert reports were due on or before November 30, 2012.[3]  All defendants who have been served have filed Motions [Doc. Nos. 24, 28, 56] for Summary Judgment.  Each of the moving defendants has submitted a Statement of Undisputed Material Facts in support of his Motion; Plaintiff has responded only with Letters [Doc. Nos. 55, 57, 58] that do not address the Defendants' arguments or supporting documentation, except to note that

---

[3] Throughout these discovery deadlines, Plaintiff was represented by counsel.  Plaintiff is now appearing pro se.

4

Plaintiff is continuing medical treatment.

This Court has considered the Motions and the various submissions of the parties and will decide the Motions on the briefs, pursuant to Federal Rule of Civil Procedure 78(b).

B.   Factual Background[4]

Plaintiff has testified that he was involved in an accident in 1989, during which he sustained injuries including a subdural hematoma, and that, approximately three months later, he began to experience both focal and grand mal seizures.  (Motion for Summary Judgment by CFG Health Systems, LLC ("CFG Motion"), Doc. No. 24, Ex. D, Plaintiff's Deposition, at 26-28.)  Plaintiff has further testified that he was prescribed Dilantin for his seizures, but that he continued to suffer focal and grand mal seizures despite the medication, including on an almost daily basis in December 2008 and January 2009, and including the day before his incarceration at Camden County Correctional Facility in January 2009.  (CFG Motion, Ex. D, Pl. Dep. at 53-57, 74.)

On January 29, 2009, Plaintiff took a dose of Dilantin at approximately 10:00 a.m. and planned to take another dose six to eight hours later.  (CFG Motion, Ex. D, Pl. Dep. at 74-77.) However, he was arrested during a court appearance and was

---

[4] The material facts giving rise to Plaintiff's claims are not in dispute, for purposes of the pending Motions, except where noted.

remanded to Camden County Correctional Facility, at
approximately 3:00 p.m.[5]  He did not have his Dilantin with him
at that time.   When remanded to the jail, Plaintiff participated
in an intake procedure that involved interviews with
correctional staff and with a Licensed Practical Nurse, who was
an employee of Defendant CFG Health Systems, LLC.  Plaintiff
advised the nurse that he suffered from a seizure disorder; the
nurse made a notation on Plaintiff's chart and gave him a red
wristband with notations to alert correctional staff that
Plaintiff suffered from a seizure disorder and should be given a
lower bunk.   The nurse also gave the transporting officer a card
indicating that Plaintiff should be given a lower bunk.   In
addition, the nurse flagged Plaintiff's chart to indicate to the
charge nurse that Plaintiff should see a doctor at the next
doctor call day.

---

[5] Plaintiff has stated that he was convicted of a drug offense in
state court, in 2005, and that he received a sentence of
probation conditioned upon participation in the Sheriff's Labor
Assistance Program ("SLAP program").   His arrest in January 2009
was occasioned by his failure to call in, as required by the
SLAP program.   (CFG Motion, Ex. C, Pl. Resp. to Interrogatory
No. 24; CFG Motion, Ex. D, Pl. Dep. at 70.)   The SLAP program is
a New Jersey statutory program which permits the governing body
of each county to establish a labor assistance program as an
alternative to direct incarceration for certain offenders.   See
N.J.S.A. 28:19-5.   Accordingly, it appears that Plaintiff is a
convicted and sentenced offender and that, therefore, his claims
concerning his medical care while incarcerated arise under the
Eighth Amendment.   See Bell v. Wolfish, 441 U.S. 520, 535, n.16
(1979); Natale v. Camden County Correctional Facility, 318 F.3d
575, 581 (3d Cir. 2003).

Plaintiff concluded this interview and was taken to his cell at 7:00 or 8:00 p.m.  (CFG Motion, Ex. D, Pl. Dep. at 78-83; Ex. E, Dep. of Leah Green at 6-14, 28, 31-32.)  The nurse testified at deposition that she was trained that CFG policy was that any prisoner who reported a seizure disorder should be given a bottom bunk and should be seen by a doctor on the next doctor call day.  (CFG Motion, Ex. E, Green Dep. at 29.)

Plaintiff testified that he asked the intake nurse for Dilantin, but that she told him she could not give that to him. He also testified that he told a correctional officer that he felt like he was going to have a seizure and that he needed his Dilantin.  (CFG Motion, Ex. D, Pl. Dep. at 94-95.)

Plaintiff testified that, when he was taken to his cell, there was already an inmate occupying the lower bunk who declined to move.  Plaintiff describes his cellmate as a very large Mexican, who spoke very little English, but who explained to Plaintiff that he was a member of a Mexican gang, all of which made Plaintiff very anxious.  (CFG Motion, Ex. D, Pl. Dep. at 83-84.)  Although he had no recollection of having taken Plaintiff to his cell, Corrections Officer Justin Jones testified that, if he took an inmate with a lower bunk order to a cell in which an inmate already occupied the lower bunk, he would place the new inmate with the lower bunk order on the

floor.  (Motion of Camden County Defendants ("Camden County

Motion"), Doc. No. 28, Ex. C, Dep. of Justin Jones at 20-24.)

Plaintiff testified that he was sitting on the upper bunk,

with his legs dangling over the side, later on the evening of

January 29, when he suffered a seizure and lost consciousness.

He did not state why he was sitting on the upper bunk rather

than the floor.  Plaintiff testified that he awoke on the floor,

that he had dislocated three fingers which he manipulated back

into place, and that he was bleeding from his head.  Plaintiff

also testified that he experienced pain radiating down his neck,

back, and limbs.  (CFG Motion, Ex. D, Pl. Dep. at 85-89.)[6]

Plaintiff testified that he was taken to the medical unit,

where the bleeding on his head was treated, he was given

Dilantin, and he was given pain medication.  After that, he was

returned to his cell.  (CFG Motion, Ex. D, Pl. Dep. at 97-100.)

Plaintiff testified that it took about two months to get an X-

ray of his neck.  (CFG Motion, Ex. D, Pl. Dep. at 96.)  During

the rest of his incarceration, Plaintiff was regularly given his

Dilantin medication.  (CFG Motion, Ex. D, Pl. Dep. at 101-02.)

Plaintiff further testified that he submitted numerous

---

[6] There is disagreement as to whether Plaintiff suffered this
seizure on the 29th or the 30th, and whether, if he suffered the
seizure on the 30th, he had been given a dose of Dilantin prior
to the seizure.  These factual disputes are not material to the
resolution of the pending Motions.

requests for medical services for his neck.  (CFG Motion, Ex. D, Pl. Dep. at 104-05.)  On March 6, 2009, Plaintiff underwent an X-ray of his cervical spine at the Camden County Correctional Facility.  (Motion for Summary Judgment by Nuranjah H. Holland ("Holland Motion"), Doc. No. 56, Ex. B, X-Ray Report.)  The X-ray showed "degenerative narrowing of the C4-C5, C5-C6 and C6-C7 disc spaces.  There are associated osteophytes at these levels. An osteophyte at the anterior superior corner of the body of C6 appears fractured."  (Holland Motion, Ex. B, X-Ray Report.)  The reporting radiologist expressed the impression that Plaintiff had "degenerative discogentic and spondolytic changes in the mid and lower cervical spine with an apparent fracture and osteophyte at the anterior superior corner of the body of C6 of uncertain age."  (Holland Motion, Ex. B, X-Ray Report.)

Plaintiff was released from Camden County Correctional Facility on March 27, 2009, immediately after which he went to the emergency room at Underwood Memorial Hospital in Woodbury, New Jersey, where he underwent a CT-scan.  (Holland Motion, Ex. C, Underwood Memorial Hospital Emergency Report.)  The CT-scan report was generally consistent with the earlier X-ray, showing "severe disc space narrowing at C4/5, C5/6 and C6/7 with associated hypertrophic changes of the vertebral body endplates and uncovertebral joints.  No fracture or bony lesion is identified.  ...  Small bubbles of gas along the margin of the

9

left C6/7 neural foramina, and the right and left C4/5 neural
foramina could be related to degenerative changes in the joints
or from degenerative disc disease." (Holland Motion, Ex. D, CT-
scan Report.)  On April 20, 2009, Plaintiff visited a Dr.
Bundens, reporting neck and bilateral arm pain.  Dr. Bundens
reviewed Plaintiff's CT scan of March 27, 2009, noting that
"this does demonstrate multiple level disc problems with what
appears to be some element of stenosis."  Dr. Bundens's initial
assessment was "cervical disc disease with bilateral cervical
radiculopathies due to stenosis."  Dr. Bundens recommended
further evaluation.  (Holland Motion, Ex. E, Dr. Bundens Notes.)

On April 23, 2009, at approximately 5:00 p.m., three days
after his visit to Dr. Bundens, Plaintiff was involved in a
motor vehicle accident in which Defendant Holland's vehicle
contacted the rear of a vehicle in which Plaintiff was a
passenger.  (Holland Motion, Ex. F, Police Investigation
Report.)  Defendant Holland testified that the accident occurred
when she was stopped behind several other cars at an
intersection.  She was looking back to see when a nearby light
would change, and waiting for several other cars to finish
turning.  She stated that she then took her foot off the brake
and moved forward, expecting the person in front of her to have
also moved.  (Holland Motion, Ex. G, Dep. of Nuranjah Holland,
at 8.)  She further testified that she "barely" put her foot on

the gas pedal and that her car was travelling under five miles
an hour for a distance of three to four feet before it came into
contact with the other car, in which Plaintiff was riding.
(Holland Motion, Ex. G., Holland Dep., at 9.)  Defendant Holland
described the impact as a "very mild bump."  (Holland Motion,
Ex. G., Holland Dep., at 8.)  Plaintiff was already wearing a
neck brace at the time of the accident; Ms. Holland testified
that she asked Plaintiff if he was all right and Plaintiff
responded that he was all right.  (Holland Motion, Ex. G.,
Holland Dep., at 14.)  Ms. Holland also testified that Plaintiff
told the responding police officer that he was all right and did
not require medical attention.  (Holland Motion, Ex. G., Holland
Dep., at 15.)

Similarly, Plaintiff testified that the car in which he was
riding was stopped at a yield sign when they were "rear-ended."
(Holland Motion, Ex. A., Pl. Dep. at 117.)  The police report
notes that there were no reported injuries and that both cars
were able to drive away from the scene.  (Holland Motion, Ex. F,
New Jersey Police Crash Investigation Report, at 2.)

Immediately following the accident, Plaintiff continued to
a previously-scheduled appointment with his physician, Dr. Jon
Heist.  (Holland Motion, Ex. A, Pl. Dep. at 175.)  On April 29,
2009, Plaintiff underwent an MRI of his cervical spine, which
yielded the diagnostic impression of "[d]egenerative change of

11

the mid to lower cervical spine resulting in bilateral neural foraminal encroachment at the C4-5 through C6-7 levels." (Holland Mot., Ex. I, Report of Denise W. Fog, D.O., dated April 30, 2009.)  A week later, Plaintiff visited Dr. Kenneth Heist, an orthopedist.  (Holland Motion, Ex. J, Dr. K. Heist Report dated May 5, 2009.)  Dr. K. Heist's report reflects that Plaintiff discussed his January 29, 2009, seizure in the jail, but did not discuss the April 23, 2009, automobile accident. (Holland Motion, Ex. J.)  Dr. Kenneth Heist reviewed the MRI and expressed the impression that Plaintiff suffered from an acute cervical sprain as well as degenerative disc disease.  (Holland Motion, Ex. J.)

On May 21, 2009, Plaintiff visited Dr. Luis Cervantes, a neurological surgeon.  Dr. Cervantes's Report reflects that Plaintiff reported suffering a grand mal seizure while incarcerated, but the report does not mention the automobile accident.  Dr. Cervantes's Report further reflects his conclusion that the MRI showed "a herniated disk towards the left at C6-C7 and C5-C6 with midline herniated disk at C4-C5 with spinal cord compression on the left at C5-C6 and C6-C7." (Holland Motion, Ex. K, Dr. Cervantes Report, dated May 21, 2009.)  Plaintiff underwent cervical spine fusion by Dr. Cervantes on June 5, 2009.  (Holland Motion, Ex. N, Virtua Health records.)  Dr. Cervantes prepared additional reports on

July 16, 2009, July 29, 2009, August 26, 2009, October 20, 2009, January 28, 2010, April 29, 2010, October 28, 2010, and January 6, 2011, none of which contain any reference to the April 23, 2009, automobile accident.  (Holland Motion, Ex. L, Dr. Cervantes Reports.)  Dr. Cervantes first refers to the automobile accident in a report to counsel, dated January 9, 2012, after this litigation was commenced.  (Holland Motion, Ex. O.)

On August 20, 2009, Plaintiff underwent an EMG/Nerve Conduction Study, completed by Dr. George A. Knod, D.O.  Dr. Knod's records do not reflect that Plaintiff reported to him the April 23, 2009, automobile accident.  (Holland Motion, Ex. M, Dr. Knod Report dated August 20, 2009.)

This litigation followed, culminating in the pending Motions for summary judgment.

## II.   JURISDICTION

This Court exercises subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3), in that the Complaint alleges federal civil rights claims under 42 U.S.C. §§ 1983 and 1985(3).  See Max v. Republican Comm. of Lancaster County, 587 F.3d 198, 199 n.1 (3d Cir. 2009), cert. denied 560 U.S. 925 (2010).

This Court exercises supplemental jurisdiction over any pendent state law claims under 28 U.S.C. § 1367.  See DeAsencio

13

v. Tyson Foods, Inc., 342 F.3d 301, 307-08 (3d Cir. 2003).

Although § 1367 permits a district court to decline the exercise

of supplemental jurisdiction if it has dismissed all claims over

which it has original jurisdiction, see Carlsbad Tech., Inc. v.

HIF Bio, Inc., 556 U.S. 635, 639-40 (2009), the district court's

discretion "is not unbridled."  Kach v. Hose, 589 F.3d 626, 650

(3d Cir. 2009).  "Rather, the decision 'should be based on

considerations of 'judicial economy, convenience and fairness to

the litigants.''"  Kach, 589 F.3d at 650 (citations omitted).

Here, discovery has concluded; the parties have retained expert

witnesses in support of their claims, whose opinions have been

proffered to the Court; and the federal and state law claims

present related factual and legal issues.  Accordingly, this

Court will exercise its discretion to retain jurisdiction over

the state law claims and to resolve them, here.  See Schneider

v. Shah, 507 F.App'x 132, 138 (3d Cir. 2012) (affirming district

court decision to retain jurisdiction over -- and grant summary

judgment on -- claims under the New Jersey Law Against

Discrimination, after granting defendants summary judgment with

respect to nearly identical claims under the federal Americans

With Disabilities Act).

III.  SUMMARY JUDGMENT

A.   Federal Rule of Civil Procedure 56

A district court shall grant summary judgment, as to any

14

claim or defense, "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).  Thus, summary judgment is appropriate where the Court is satisfied that "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (citing Fed.R.Civ.P. 56).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  Id.  "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Id. at 247-48 (emphasis in original).

Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact.  See Fed.R.Civ.P. 56(c)(1), (4); Celotex, 477 U.S. at 323 ("[A]

15

party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." (citation omitted)); see also Singletary v. Pa. Dept. of Corr., 266 F.3d 186, 192 n.2 (3d Cir. 2001) ("Although the initial burden is on the summary judgment movant to show the absence of a genuine issue of material fact, 'the burden on the moving party may be discharged by "showing" - that is, pointing out to the district court - that there is an absence of evidence to support the nonmoving party's case' when the nonmoving party bears the ultimate burden of proof." (citing Celotex, 477 U.S. at 325)).

Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Celotex, 477 U.S. at 324. "[T]he non-moving party, to prevail, must 'make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Cooper v. Sniezek, 418 F.App'x 56, 58 (3d Cir. 2011) (citing Celotex, 477 U.S. at 322). Thus, to withstand a properly supported motion for summary

16

judgment, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (citations omitted).  Instead, the non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324; see also Lujan v. National Wildlife Fed'n, 497 U.S. 871, 888 (1990) ("The object of [the Rule] is not to replace conclusory allegations of the complaint ... with conclusory allegations of an affidavit."); Anderson, 477 U.S. at 249; Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992), cert. denied, 507 U.S. 912 (1993) ("To raise a genuine issue of material fact, ... the opponent need not match, item for item, each piece of evidence proffered by the movant," but must "exceed[] the ' mere scintilla' threshold and ... offer[] a genuine issue of material fact.").

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (citing Anderson, 477 U.S. at 255).

17

In making this determination, however, the court may consider materials in the record other than those cited by the parties. Fed.R.Civ.P. 56(c)(3).

Here, Plaintiff has failed to submit a counter-statement of material facts or otherwise to dispute the statements of material facts submitted by the moving Defendants.  Accordingly, this Court will consider the facts, as presented by the moving Defendants, undisputed for the purposes of considering the Motions.  See Fed.R.Civ.P. 56(e)(2).  Even when a motion for summary judgment is unopposed, however, summary judgment is not automatic; the district court still must determine whether the moving party is entitled to judgment as a matter of law.  See Anchorage Assocs. v. V.I. Bd. of Tax Review, 922 F.2d 168, 175 (3d Cir. 1990), cited in Brandon v. Warden, Northern State Prison, Civil No. 05-3031, 2006 WL 1128721, *6 (D.N.J. April 27, 2006).

## IV.   DISCUSSION

A.   42 U.S.C. 1985(3)

Plaintiff has asserted that the Camden County Defendants have violated his rights under 42 U.S.C. § 1985(3).

Title 42 Section 1985 provides, in relevant part:

> If two or more persons in any State or Territory conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; ...  the person so injured or

18

> deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3).  To prevail under Section 1985(3), one must establish:

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

<u>United Broth. of Carpenters and Joiners of America, Local 610, AFL-CIO v. Scott</u>, 463 U.S. 825, 829 (1983).  <u>See also</u> <u>Farber v. City of Paterson</u>, 440 F.3d 131, 135 (3d Cir. 2006).

With respect to the "conspiracy" element, the Supreme Court has held, even in the pleading context, that there must be more than a blanket allegation of conspiracy, there must be "enough factual matter (taken as true) to suggest that an agreement was made. ... It makes sense to say, therefore, that an allegation of parallel conduct and a bare assertion of conspiracy will not suffice." <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 556-57 (2007).  Here, after a full opportunity for discovery, Plaintiff has failed to provide any evidence to sustain the bald assertion of conspiracy contained in the Third Amended Complaint.

With respect to the second element, the conspiracy must be motivated by "some racial, or perhaps otherwise class-based,

invidiously discriminatory animus." Griffin v. Breckenridge,
403 U.S. 88, 102 (1971), quoted in Farber v. City of Paterson,
440 F.3d 131, 135 (3d Cir. 2006).  Thus, in order to prevail,
there must be evidence suggesting some racial or otherwise
invidiously discriminatory animus behind the alleged
conspirators' actions.  See Kush v. Rutledge, 460 U.S. 719, 724-
26 (1983).[7]  However, no such evidence of discriminatory animus
has been presented by Plaintiff.

Finally, of course, in the absence of any proof of
conspiracy, there is a complete absence of proof of any act in
furtherance of a conspiracy.  Accordingly, the Camden County
defendants are entitled to summary judgment with respect to this
claim.  Cf. Poku v. Himelman, Civil No. 08-0209, 2010 WL
5186174, *5 (D.N.J. Dec. 15, 2010) (granting summary judgment
where plaintiff's "proof" of conspiracy consisted solely of
"unsupported allegations of association" among the defendants),

---

[7] The Court of Appeals for the Third Circuit has held that the
reach of § 1985(3) does extend to persons with intellectual
disabilities.  See Lake v. Arnold, 112 F.3d 682, 865 (3d Cir.
1997).  In Lake, however, the Court expressly declined "to
define the class protected more broadly to include a wider range
of handicaps or the handicapped in general," although the Court
stated that it could "envision other cases which might fall
within the analysis" set forth in that opinion.  Lake, 112 F.3d
at 686, n.5.  For purposes of deciding the Motions, this Court
will assume that § 1985(3) could apply to physical disabilities,
such as Plaintiff's seizure disorder.

aff'd, 448 F.App'x 217 (3d Cir. 2011), cert. denied, 132 S.Ct. 2386 (2012).

B.   The Eighth Amendment Claim

Plaintiff asserts that the Camden County Defendants and CFG acted with deliberate indifference to his safety, a claim arising under the Eighth Amendment.[8]

The Eighth Amendment to the United States Constitution, applicable to the individual states through the Fourteenth Amendment, prohibits the states from inflicting "cruel and unusual punishments" on those convicted of crimes.  Rhodes v. Chapman, 452 U.S. 337, 344-46 (1981).  This proscription against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care.  Estelle v. Gamble, 429 U.S. 97, 103-04 (1976).  In order to prevail on a claim for a violation of his right to adequate medical care, an inmate must demonstrate: (1) a serious medical need, (2) behavior on

---

[8] Title 42 U.S.C. § 1983 establishes a cause of action for persons who are deprived of a constitutional right by a person acting under color of state law.  See West v. Atkins, 487 U.S. 42, 48 (1988); Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011).

A jail, however, is not a "person" amenable to suit under 42 U.S.C. § 1983.  See, e.g., Parrish v. Aramark Foods, Inc., No. 11-5556, 2012 WL 1118672, *3 (D.N.J. April 2, 2012) (collecting cases); Fischer v. Cahill, 474 F.2d 991, 992 (3d Cir. 1973) (holding that New Jersey Prison Medical Department is not a "person" under § 1983).  For this reason, alone, the Camden County Correctional Facility is entitled to summary judgment on the Eight Amendment claim.

the part of prison officials that constitutes deliberate
indifference to that need, and (3) causation.  Id. at 106;
Hamilton v. Leavy, 117 F.3d 742, 746 (3d Cir. 1997), cited in
Wallace v. Doe, Civil No. 10-0948, 2012 WL 2153799, *4 (M.D. Pa.
June 13, 2012), aff'd, 512 F.App'x 141 (3d Cir. 2013).

     To satisfy the first prong of the Estelle inquiry, the
inmate must demonstrate that his medical needs are serious.  See
Hudson v. McMillian, 503 U.S. 1, 9 (1992).  Serious medical
needs include those that have been diagnosed by a physician as
requiring treatment or that are so obvious that a lay person
would recognize the necessity for a doctor's attention, and
those conditions which, if untreated, would result in lifelong
handicap or permanent loss.  Monmouth County Correctional
Institutional Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir.
1987), cert. denied, 486 U.S. 1006 (1988).

     The second element of the Estelle test requires an inmate
to show that prison officials acted with deliberate indifference
to his serious medical need.  "Deliberate indifference" is more
than mere malpractice or negligence; it is a state of mind
equivalent to reckless disregard of a known risk of harm.
Farmer v. Brennan, 511 U.S. 825, 837-38 (1994).  More
specifically, to hold a prison official liable for a violation
of the Eighth Amendment right to adequate medical treatment,
"the official must both be aware of facts from which the

22

inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837, quoted in Bearam v. Wigen, 542 F.App'x 91, 91 (3d Cir. 2013).

Furthermore, a prisoner's subjective dissatisfaction with his medical care does not in itself indicate deliberate indifference. Andrews v. Camden County, 95 F.Supp.2d 217, 228 (D.N.J. 2000); Peterson v. Davis, 551 F.Supp. 137, 145 (D. Md. 1982), aff'd, 729 F.2d 1453 (4th Cir. 1984). Similarly, "mere disagreements over medical judgment do not state Eighth Amendment claims." White v. Napoleon, 897 F.2d 103, 110 (3d Cir. 1990). "Courts will disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment ... [which] remains a question of sound professional judgment. Implicit in this deference to prison medical authorities is the assumption that such informed judgment has, in fact, been made." Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979) (internal quotation and citation omitted).

"Where prison authorities deny reasonable requests for medical treatment, however, and such denial exposes the inmate 'to undue suffering or the threat of tangible residual injury,' deliberate indifference is manifest. Similarly, where 'knowledge of the need for medical care [is accompanied by the] ... intentional refusal to provide that care,' the deliberate indifference standard has been met. ... Finally, deliberate

indifference is demonstrated '[w]hen ... prison authorities
prevent an inmate from receiving recommended treatment for
serious medical needs or deny access to a physician capable of
evaluating the need for such treatment." Monmouth County Corr.
Inst. Inmates v. Lanzaro, 834 F.2d at 346 (citations omitted).
"Short of absolute denial, 'if necessary medical treatment [i]s
... delayed for non-medical reasons, a case of deliberate
indifference has been made out." Id. (citations omitted).

Here, there is no debate that a seizure disorder
constitutes a serious medical condition.  Plaintiff has failed
to come forward, however, with sufficient evidence of deliberate
indifference or causation to avoid summary judgment.  Insofar as
the element of "deliberate indifference" is concerned, the
undisputed evidence before the Court reflects that there was in
place at Camden County Correctional Facility a procedure to take
a medical history from every incoming inmate, to note the
existence of a seizure disorder on the medical history, to
schedule a prisoner with a seizure disorder for the next
available doctor call day, and to assign a prisoner with a
seizure disorder a lower bunk.  To the extent that a prisoner
with a lower bunk designation was assigned to a cell where
another prisoner already occupied the lower bunk, as happened
with Plaintiff, the prisoner with the lower bunk designation had
the option to place his mat on the floor, rather than occupy the

upper bunk.  The policy in place, as well as the practice of the CFG nurse who took Plaintiff's medical history, reflect that a medical judgment sensitive to the needs of prisoners with seizure disorders was in fact made, both in the creation of the general policy and in the application of that policy to Plaintiff.  Plaintiff has presented this Court with no evidence to suggest that he was required to occupy the upper bunk rather than the floor.  His apparently unilateral decision to occupy the upper bunk, rather than the floor, does not establish deliberate indifference by any Defendant here.

Finally, in the absence of a response from Plaintiff, this Court is left with some difficulty ascertaining his theory of causation.  To counter any theory that Plaintiff's seizure was caused by the failure to receive a dose of Dilantin on the evening of January 29, 2009, the Camden County Defendants and CFG have supported their Motions with the expert opinion of Ram Mani, M.D., an Assistant Professor of Neurology at UMDNJ - Robert Wood Johnson Medical School in New Brunswick, New Jersey. (Camden County Motion, Ex. D, Report of Dr. Mani.)  Dr. Mani reviewed Plaintiff's medical records and came to the following conclusions, to a reasonable degree of medical probability.[9]

---

[9] Dr. Mani noted that "[t]he understanding of this patient's risk of epileptic seizures is somewhat limited due to a lack of EEG test results and brain MRI results."  (Camden County Motion, Ex. D, Report of Dr. Mani, at 5.)

**Discussion**   From the existing evidence, it is unlikely that most or all of the alleged seizures that patient complains of are epileptic seizures.  It is estimated that it is more likely than not that most of his seizures are psychogenic nonepileptic seizures (PNES: "pseudoseizures").  It is more likely than not that missing Dilantin for approximately 24 hours had no major impact on probability of a seizure during this period.  This is based on his alleged high seizure frequency leading up to the 1/29/[2009] incarceration and other Dilantin details in this case.

The facts supporting the existence of PNES in this case are:

(1) long periods (e.g. couple years or more) of no seizures despite not taking Dilantin (2008 Heist notes) for difficult to control seizures.  ...

(2) atypical seizure behaviors of tunnel followed by facial tightening.  ...

(3) It is conceivable that epileptic seizures may begin 3 months after head trauma and subdural hematoma.  However, this kind of trauma most often leads to a "localization-related" epilepsy syndrome. ...

(4) Lack of postictal confusion after his 1/2009 alleged seizure causing loss of consciousness and fall in prison.  ...

(5) Dilantin was the patient's single conventional antiseizure drug used over the 1989 to present; others were used for months or few years.  Review of pharmacy dispensing records reveals NO Dilantin dispensing from 2007 to 4/10/2009 (Walmart, CVS, Rite Aid).  While incarcerated in 2007, Dilantin was given as 100 mg daily from 2/4/2007 - 3/21/2007.  Despite receiving a much lower than normal dose during this monitored period, ongoing seizures were not noted in the prison records for 2007.  Presumably the patient was not having seizures in 2007-2008 when not taking Dilantin. It is unlikely in a PWE and uncontrolled seizures to be seizure-free during long periods of insufficient dosed Dilantin or when not using Dilantin.

26

(6) The patient engaged in risky behaviors that most
PWE do not perform when having uncontrolled seizures.
He reports driving while being treated for an
uncontrolled seizure disorder.  He frequently used
tramadol (up to 5x/d) despite being counseled it can
make seizures more likely to occur by lowering the
seizure threshold.

Finally, doubt exists if he was taking Dilantin
reliably or at dosage correlated with a blood level
known to be therapeutic.  See #5 above.  His Dilantin
blood level was 2.8 six days after his alleged seizure
leading to a fall in prison.  It was 8.1 two weeks
after the fall.  Both of these levels are lower than
the therapeutic level range for Dilantin despite
receiving 300 mg/d for the first week and 500 mg/d for
the second week.  The steady increase in Dilantin
blood levels as the medication was started in prison
and dose increased to 500 mg/d suggest he may not have
been taking Dilantin (or not taking it reliably) prior
to incarceration.  Dilantin metabolism is
characterized by zero order kinetics; when the patient
is taking a reasonable dosage, small increases in the
dosage are prone to result in an exponential increase
in the drug level over time.  The Dilantin levels
pattern of initially 2/8 to increasing 8/1 to
plateauing at 19 is most consistent with the patient
"newly starting" Dilantin 300 mg/d in jail.  In the
case of a patient with poorly controlled seizures and
poorly compliant Dilantin use, missing one or a few
dosages of Dilantin 100 mg 3x/d is not likely to
change the antiseizure protection offered by the drug.

(Camden County Motion, Ex. D, Report of Dr. Mani at 3-5.)

Plaintiff has failed to respond to Dr. Mani's report with

any medical evidence to suggest that his seizure was caused by

missing his evening dose of Dilantin on January 29, 2009.  To

the contrary, at his deposition, Plaintiff testified, based on

his personal experience, that the circumstances of his

incarceration were so stressful that he likely would have

suffered a seizure in any case.  (CFG Motion, Ex. D, Pl. Dep. at 96.)  To take a contrary position in response to the Motions for summary judgment, he must support with medical evidence any claim that the allegedly missed dose of Dilantin caused his seizure.  See, e.g., Aruanno v. Glazman, 316 F.App'x 194 (3d Cir. 2009) (collecting cases and detailing the circumstances under which a medical expert is required in order to establish causation).  Accordingly, there is no evidence to support the theory that a missed dose of Dilantin caused Plaintiff's seizure.

Plaintiff fares no better under the theory that his injuries were caused by his cell assignment.  Plaintiff was designated to a lower bunk, and he has failed to respond to the testimony of Corrections Officer Justin Jones that Plaintiff could have placed his mat on the floor and occupied floor space, rather than the upper bunk.  Thus, based on the undisputed evidence before the Court, the cause of Plaintiff's fall appears to be his own decision to occupy the upper bunk rather than the floor.

For all the foregoing reasons, the Camden County Defendants and CFG have established their entitlement to summary judgment with respect to Plaintiff's Eighth Amendment medical care

claim.[10]


C.     The New Jersey Law Against Discrimination

Plaintiff has alleged that some or all of the Defendants
failed to make reasonable accommodations for his medical
conditions in violation of the New Jersey Law Against
Discrimination.

The New Jersey Law Against Discrimination ("NJLAD")
provides as follows:

> All persons shall have the opportunity to obtain
> employment, and to obtain all the accommodations,
> advantages, facilities, and privileges of any place of
> public accommodation, publicly assisted housing
> accommodation, and other real property without
> discrimination because of ... disability, ... subject
> only to conditions and limitations applicable alike to
> all persons. This opportunity is recognized as and
> declared to be a civil right.

N.J.S.A. 10:5-4.

Whether a correctional facility is a "place of public
accommodation" has not been determined by New Jersey's courts.
See Manasco v. New Jersey Dept. of Corrections, 2010 WL 5348758,
(N.J. Super. App. Div. Dec. 27, 2010).  The Courts of this
District, however, have regularly held that correctional
facilities are places of public accommodation within the meaning

---

[10] In light of the Court's decision, it need not consider other
grounds for summary judgment asserted by the Camden County
Defendants and CFG, including, for example, the lack of
vicarious liability in § 1983 actions.

of the NJLAD.  See, e.g., Anderson v. County of Salem, Civil No. 09-4718, 2010 WL 3081070, *11 (D.N.J. Aug. 5, 2010) (collecting cases).  See also Chisolm v. McManimon, 97 F.Supp.2d 615, 621-22 (D.N.J. 2000), rev'd and remanded on other grounds, 275 F.3d 315 (3d Cir. 2001) (predicting that the New Jersey Supreme Court would find that jails and prisons are "places of public accommodation").

New Jersey courts have held that the NJLAD should be construed liberally, see Franek v. Tomahawk Lake Resort, 333 N.J. Super. 206, 217 (App. Div. 2000), with a view toward effectuating its goal of "the eradication of the cancer of discrimination," see Jackson v. Concord Co., 54 N.J. 113 (1969), quoted in Dale v. Boy Scouts of America, 160 N.J. 526, 584 (1999), rev'd and remanded on other grounds, 530 U.S. 640 (2000).

"New Jersey courts generally interpret the LAD by reliance upon [the construction of] analogous federal antidiscrimination statutes."  Chisolm, 97 F.Supp.2d at 621.  Accordingly, it is appropriate to analyze an NJLAD disability discrimination claim by applying the 3-part test employed to analyze claims under the federal Americans with Disabilities Act.  See Lawrence v. Nat'l Westminster Bank N.J., 98 F.3d 61, 70 (3d Cir. 2006).  See also Brewer v. Hayman, Civil No. 06-6294, 2009 WL 2139429, *9 (D.N.J. July 10, 2009) (citing D.G. v. Somerset Hills Sch. Dist., 559

30

F.Supp.2d 484, 502-03 (D.N.J. 2008)).  That is, to prevail, Plaintiff must establish either that he "(1) has a disability, (2) is a qualified individual, and (3) has suffered an adverse action because of that disability" or that he "(1) has a disability, (2) is otherwise qualified to participate in a program, and (3) was denied the benefits of the program or discriminated against because of the disability."  <u>D.G. v. Somerset Hills</u>, 559 F.Supp.2d at 503 (citations omitted).

Here, for purposes of deciding the pending Motions, this Court will assume that Plaintiff's seizure disorder is a "disability," and that Camden County Correctional Facility is a "place of public accommodation."  Nevertheless, Plaintiff has presented no evidence, whatsoever, to suggest that any of the Defendants denied him appropriate medical care because of his seizure disorder.  To the contrary, corrections officials made appropriate efforts to accommodate Plaintiff's disability by assigning him a lower bunk, offering him the opportunity to bunk on the floor when the lower bunk in his cell was occupied, and scheduling him for an appointment on the next doctor visit day.  The moving Defendants are entitled to summary judgment with respect to this claim.

D.   <u>The New Jersey Civil Rights Act</u>

Plaintiff alleges that all Defendants violated his rights under the New Jersey Civil Rights Act.

31

The New Jersey Civil Rights Act, N.J.S.A. 10:6-1, et seq.,
provides, in pertinent part, as follows:

> Any person who has been deprived of any substantive
> due process or equal protection rights, privileges or
> immunities secured by the Constitution or laws of the
> United States, or any substantive rights, privileges
> or immunities secured by the Constitution or laws of
> this State, or whose exercise or enjoyment of those
> substantive rights, privileges or immunities has been
> interfered with or attempted to be interfered with, by
> threats, intimidation or coercion by a person acting
> under color of law, may bring a civil action for
> damages and for injunctive or other appropriate
> relief. ...

N.J.S.A. 10:6-2(c).

The New Jersey Civil Rights Act is interpreted analogously
to 42 U.S.C. § 1983.  See Pitman v. Ottehberg, Civil No. 10-
2538, 2013 WL 6909905, *8 (D.N.J. Dec. 31, 2013) (collecting
cases).

Here, as noted above, Plaintiff has failed to establish
that any of the named Defendants deprived him of any right
secured by the laws or constitutions of the United States or the
State of New Jersey.  Accordingly, they are not liable to
Plaintiff under the New Jersey Civil Rights Act.  See Pitman,
2013 WL 6909905 at *8; Martin v. Unknown U.S. Marshals, Civil
No. 10-0066, 2013 WL 4431789, *34 (D.N.J. Aug. 15, 2013).

E.   State Law Negligence

Plaintiff contends that the Camden County Defendants and
Defendant Holland are liable for negligence under state law.

32

"'[T]o sustain a common law cause of action in negligence'
under New Jersey law, 'a plaintiff must prove four core
elements: (1) a duty of care, (2) a breach of that duty,
(3) proximate cause, and (4) actual damages.'" Aymonier v. U.S.,
432 F.App'x 66, 67 (3d Cir. 2011) (quoting Polzo v. County of
Essex, 196 N.J. 569, 584 (2008)).  See also Natale v. Camden
County Correctional Facility, 318 F.3d 575, 579 and n.3 (3d Cir.
2003).

This Court has already noted Plaintiff's failure to produce
any evidence suggesting that the Camden County Defendants caused
either his seizure or his fall.  Accordingly, the Camden County
Defendants are entitled to summary judgment on Plaintiff's state
law negligence claims, also.

With reference to the state law negligence claim against
Defendant Holland, the driver of the automobile which rear-ended
the vehicle in which Plaintiff was a passenger, Plaintiff
contends that Defendant Holland is liable to him for causing an
injury or aggravating a pre-existing condition.  (Third Amended
Complaint, ¶ 37.)  New Jersey imposes special obligations on a
plaintiff asserting aggravation of a pre-existing injury.

> When aggravation of a pre-existing injury is pled
> by a plaintiff, comparative medical evidence is
> necessary as part of a plaintiff's prima facie and
> concomitant verbal threshold demonstration in order to
> isolate the physician's diagnosis of the injury or
> injuries that are allegedly "permanent" as a result of
> the subject accident.  Causation is germane to the

33

> plaintiff's theory of aggravation of a pre-existing
> injury or new independent injury to an already injured
> body part.  In such matters, a plaintiff generally
> bears the burden of production in respect of
> demonstrating that the accident was the proximate
> cause of the injury aggravation or new permanent
> injury to the previously injured body part.  Such
> evidence provides essential support for the pled
> theory of a plaintiff's cause of action and a
> plaintiff's failure to produce such evidence can
> result in a directed verdict for defendant.

<u>Davidson v. Slater</u>, 189 N.J. 166, 185-86 (2007) (citations

omitted).

In support of his claim, Plaintiff has submitted the

January 9, 2012, opinion letter of his treating neurological

surgeon, Luis Cervantes, M.D.  (Holland Motion, Ex. O.)  The

letter recites Dr. Cervantes's examination, diagnosis, and

treatment of Plaintiff.

> Mr. Conchewski is a 47-year-old right-handed male that
> was serving time at the Camden County [Correctional]
> facility in Cranbury New Jersey, January 2009, had a
> seizure while he was in solitary confinement,
> sustained injuries to his cervical spine, that left
> him with cervical pain, headaches, bilateral upper
> extremity pain, the left more than the right, pain
> when he was seen by me was 9-10 on the VAS.  ...  His
> physical examination was suggestive of myelopathy, and
> an MRI of his cervical spine showed a herniated disk
> towards the left at C6-C7 and at C5-C6 while a medial
> herniated disk at C4-C5.  I suggested at that time
> that we need[ed] to salvage the remainder of his
> spinal cord fusion and recommended a C4-C5, C5-C6, and
> C6-C7 anterior cervical diskectomy and arthrodesis.
> At the time of his initial office visit, he had
> complaint of cervical pain, suboccipital headaches,
> and bilateral upper extremity pain with right upper
> extremity and stiffness of his lower extremities.
>
> On June 5, 2009, he had underwent an anterior cervical

34

diskectomy and arthrodesis at C4-C5, C5-C6, and C6-C7,
procedure that was uncomplicated, and he returned for
followup on July 16, 2009.  ...  At some point, he had
told that he had also [been] involved in a motor
vehicle accident on April 23, 2009.  This we did not
know till we received the communication from GEICO
insurance dated November 25, 2009, in which we were
told that he had been involved in a motor vehicle
accident, and that he [had] sustained injuries to his
cervical spine at that time.

...

Mr. Conchewski was initially seen in this office in
May 29, 2009.  Prior to his office visit, he had been
involved in an accident at the Camden County jail
where he had injury of his cervical spine, and that
subsequently was aggravated when a motor vehicle
accident that he was involved in April 23, 2009.  When
I first saw him, he complained of cervical pain with
suboccipital headaches, bilateral upper extremity
pain, right upper extremity paresthesias, and
stiffness of his lower extremities, and I found him to
have signs of myelopathy with herniated disks and
anterior cervical cord compression.  Mr. Conchewski's
spinal cord injury is permanent in nature, and I do
not think that he will ever improve from it.  With a
reasonable degree of medical probability, the injuries
that he had to his cervical spine and spinal cord were
result of both accidents that he was involved in prior
to me seeing him in May 2009, the second accident
worsening his initial medical condition that he
suffer[ed] from his initial injury in January 2009.

(Holland Motion, Ex. O, Letter of Luis Cervantes, M.D.)

     Defendant Holland counters that Dr. Cervantes's opinion is

not admissible because it is a "net opinion" that does not meet

the "reliability or "fit" requirements of Rule 702.[11]  This Court

_____

[11] New Jersey law excludes "net opinions" which contain "bare
conclusions, unsupported by factual evidence."  See Holman
Enter. v. Fidelity & Guar. Ins. Co., 563 F.Supp.2d 467, 472 n.12
(D.N.J. 2008) (citing Buckelew v. Grossbard, 87 N.J. 512 (N.J.

agrees.

Rule 702 governs the admissibility of expert testimony and

provides:

> A witness who is qualified as an expert by knowledge,
> skill, experience, training, or education may testify
> in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other
> specialized knowledge will help the trier of fact to
> understand the evidence or to determine a fact in
> issue;
> (b) the testimony is based on sufficient facts or
> data;
> (c) the testimony is the product of reliable
> principles and methods; and
> (d) the expert has reliably applied the principles and
> methods to the facts of the case.

Fed.R.Evid. 702.

The Court of Appeals for the Third Circuit has

characterized these requirements as qualification, reliability,

and fit.  Calhoun v. Yamaha Motor Corp., U.S.A., 350 F.3d 316,

321 (3d Cir. 2003) (citing Schneider v. Fried, 320 F.3d 396, 405

(3d Cir. 2003)).

> We have addressed the requirements of Fed.R.Evid. 702,
> focusing on the "trilogy of restrictions on expert
> testimony:  qualification, reliability and fit."

---

1981)).  However, "[t]he 'net opinion' rule is neither an
evidentiary rule under the Federal Rules of Evidence nor a
factor in the Daubert [v. Merrell Dow Pharmaceuticals, Inc., 509
U.S. 579, 590 (1993),] analysis."  Id. (citing Zeller v. J.C.
Penney Co., Civil No. 05-2546, 2008 WL 906350, *7 n.13 (D.N.J.
Mar. 31, 2008)).  "The net opinion rule is merely a restatement
of the well-settled principle that an expert's bare conclusions
are not admissible under [the fit requirement of] Rule 702 of
the Federal Rules of Evidence."  Id.

> First, the witness must be qualified to testify as an
> expert. Qualification requires "that the witness
> possess specialized expertise." "We have interpreted
> this requirement liberally," holding that "a broad
> range of knowledge, skills, and training qualify an
> expert as such." Second, the testimony must be
> reliable. In other words, "the expert's opinion must
> be based on the 'methods and procedures of science'
> rather than on 'subjective belief or unsupported
> speculation'; the expert must have 'good grounds' for
> his or her belief." An assessment of "the reliability
> of scientific evidence under Rule 702 requires a
> determination as to its scientific validity." Third,
> the expert testimony must "fit," meaning "the expert's
> testimony must be relevant for the purposes of the
> case and must assist the trier of fact."

Calhoun, 350 F.3d at 321 (citations omitted). See also Daubert

v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 590 (1993)

(holding that, to be admissible under Rule 702, expert testimony

must be reliable "science," meaning grounded in the methods and

procedures of science, and it must constitute "knowledge,"

meaning something more than subjective belief or unsupported

speculation).

Here, Dr. Cervantes's opinion amounts to nothing more than

an unsupported conclusion, devoid of any articulated factual or

scientific basis, which does nothing to aid the trier of fact

with respect to the critical issue of causation. Dr. Cervantes

relies on a single MRI, presumably the April 29, 2009, MRI,

taken several days after Plaintiff's accident and before his

initial May 2009 visit with Dr. Cervantes. Dr. Cervantes's

opinion reflects no comparison of the condition of Plaintiff's

cervical spine or pain before and after the automobile accident and fails to offer any explanation for his conclusion that Plaintiff suffered any injury as a result of the accident, specifically, or that his condition changed for the worse after the accident.  Dr. Cervantes's failure to make such a comparison, by reference to Plaintiff's medical records that predate the automobile accident, including the X-ray and CT-scan, is inexplicable.  This failure is especially troubling in light of the substantial pre-existing evidence that Plaintiff's disc disease was degenerative rather than traumatic.  This Court will not consider Dr. Cervantes's report.

Defendant Holland's expert's reports support the Court's exclusionary ruling.  In support of her Motion for summary judgment, Defendant Holland presents the expert reports of surgeon Gary Neil Goldstein, M.D., which were updated as additional medical records were supplied to Dr. Goldstein. (Holland Motion, Exs. P, Q, R, S.)  Dr. Goldstein reviewed Plaintiff's medical records dating back to 2005, including the various scans and reports of those scans.  Dr. Goldstein notes that, in Dr. Heist's notes from the April 23, 2009, office visit, there is nothing to separate the problems Plaintiff was having before and after the automobile accident.  Dr. Goldstein also particularly notes the consistent references to degenerative disk disease:

According to the MRI, the clinical history is spinal
stenosis.  I would point out that spinal stenosis is a
condition which takes a long time to develop and does
not develop in the seven days between the date of
accident and date of MRI.  As I look at the film, the
reading radiologist indicates that correlation is made
with a prior CT scan of the spine performed at
Underwood Memorial Hospital on 03/27/09. As one looks
at the body of the report, the patient has multi-level
disease from C2 through C7.  This does not come from a
single impact trauma.  It is interesting that reading
radiologist Dr. Denise Fog talks about degenerative
changes in the mid to lower spine resulting in
bilateral foraminal encroachment from C4-5 through C6-
7.  By this doctor's radiographic review, there is no
sign of fresh injury in a 04/29/09 study that is
sensibly attributable to a 04/23/09 accident.  No
swelling, no change in T2 weighted image, etc.

(Holland Motion, Ex. P, at 4.)

Ultimately, with reference to these records, Dr. Goldstein

concluded as follows:

Direct review of these records brings me to the
conclusion that the 04/23/09 accident had nothing to
do with the ultimate need for surgery.  Certainly
there was no objective evidence of fresh injury in the
MRI done immediately subsequent to the 04/23/09
accident with Dr. Ponzio looking at the CT scan done
in March and saying that the CT scan and MRI basically
show the same basic pathology.

(Holland Motion, Ex. P, at 6.)  Dr. Goldstein subsequently

reviewed additional medical records and scans, repeatedly noting

the indications that Plaintiff's cervical spine disease was

degenerative in nature,[12] as evidenced by changes which take a

---

[12] For example, in reviewing Plaintiff's medical records with his
primary physician, Dr. Goldstein notes:

Under Past Medical History in this 11/17/05 report,

long time to develop, and which "are not sensibly attributed to
a single impact trauma and certainly not a single impact trauma
in January of 2009." (Holland Motion, Ex. Q.)  In reviewing the
X-ray and CT-scan images, Dr. Goldstein again notes that they
reflect degenerative changes which take a long time to develop
and which cannot be attributed to either the January 9, 2009,
fall or the April 23, 2009, automobile accident. (Holland
Motion, Exs. R, S.)

In his series of reports, Dr. Goldstein reviewed
Plaintiff's medical records for a period of several years,
focusing on both Plaintiff's self-reports of symptoms and
medical tests including X-ray, CT-scans, and MRI scans.  Dr.
Goldstein identified those aspects of the medical records that
repeatedly and reliably indicated the existence of degenerative
disc disease, including the absence of any change after the
automobile accident, for his conclusion that neither the January
29, 2009, fall nor the April 23, 2009, automobile accident
caused Plaintiff's disc disease.  Thus, the undisputed evidence
establishes that Defendant Holland is entitled to summary

---

the patient is said to have a herniated disc at C6-7.
Obviously the patient had cervical disc issues that
long pre-dated the accident of issue.  He was a smoker
and that would produce accelerated degenerative
disease.

(Holland Motion, Ex. Q, at 3.)

judgment, as Plaintiff has presented no evidence of causation in his negligence claim against her, and she has presented affirmative admissible expert evidence that the automobile accident did not cause or aggravate Plaintiff's disc disease.


                        V.   <u>CONCLUSION</u>

     For the reasons set forth above, this Court will grant the Motions [Doc. Nos. 24, 28, 56] for summary judgment.  All remaining claims against all remaining defendants will be dismissed.

     An appropriate order follows.




At Camden, New Jersey           <u>    s/Noel L. Hillman    </u>
                                Noel L. Hillman
                                United States District Judge

Dated:  March 21, 2014


                             41